## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAMINA L. BOBBITT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner for | : | |
| Social Security | : | NO. 21-5055 |

### O P I N I O N

SCOTT W. REID                                            DATE: August 24, 2023
UNITED STATES MAGISTRATE JUDGE

       Camina L. Bobbitt brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). She has filed a Request for Review to which the Commissioner has responded. As explained below, I conclude that the Request for Review should be granted in part and the matter remanded to the Agency for further consideration of the evidence with respect to Bobbitt's seizure disorder and headaches, as specified below.

I.     *Factual and Procedural Background*

       Bobbitt was born on June 17, 1974. Record at 173. She completed high school and two years of college. Record at 194. She worked in the past as a phlebotomist, and as a home healthcare aide. *Id*. On April 18, 2016, Bobbitt filed applications for DIB and SSI. Record at 173, 177. She asserted disability since 2011 as a result of schizophrenia, seizures, osteoporosis, arthritis, and balance issues. Record at 173, 177, 193.

Bobbitt's applications were denied initially, and upon reconsideration. Record at 103, 104, 108, 112. Bobbitt then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 117. A hearing was held on May 20, 2019. Record at 47. On September 26, 2019, however, the ALJ issued a written decision denying benefits. Record at 21. The Appeals Council denied Bobbitt's request for review on September 23, 2021, permitting the ALJ's decision to serve as the final decision of the Commissioner of Social Security. Record at 1. Bobbitt then filed this action.

II.   *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we

> also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record. *Id*. The RFC assessment reflects the most an individual can still do, despite any limitations. SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make the adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

III.   *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ determined that Bobbitt suffered from the severe impairments of a seizure disorder, a schizoaffective disorder, and osteoporosis. Record at 24. She found, however, that no impairment, and no combination of impairments, met or medically equaled a listed impairment. Record at 24-27.

The ALJ noted that Bobbitt also suffered from a meningioma during the relevant period. Record at 29.[1] The ALJ did not identify the meningioma as a medically determinable impairment, possibly because it did not meet the duration requirement. *See* SSR 85-28.

---

[1] According to the Mayo Clinic, "A meningioma is a tumor that arises from the meninges – the membranes that surround the brain and spinal cord. Although not technically a brain tumor, it is included in this category because it may compress or squeeze the adjacent brain, nerves and vessels." Mayoclinc.org/disease-conditions/meningioma/symptoms-causes/syc-20355643 (August 10, 2023). Meningiomas can be symptom-free,

As to Bobbitt's RFC, the ALJ wrote:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and §416.967(b), except she can occasionally push and/or pull with the bilateral upper extremities; occasionally operate foot controls; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; frequently reach; occasionally tolerate exposure to weather, non-weather-related cold and hot extreme temperatures, wetness, and humidity; and never tolerate exposure to excessive vibration, dangerous machinery with moving mechanical parts, or unprotected heights. She can perform simple, routine, and repetitive tasks that can be learned by demonstration within 30 days. She can perform work where only occasional simple decision-making is required. She can tolerate only occasional routine changes in the work environment, occasionally interact with supervisors, tolerate minimal/brief and superficial interaction with coworkers, and never interact with the public.

Record at 27.

Relying upon the testimony of a vocational expert who appeared at the hearing, the ALJ found that, although Bobbitt could not return to her past relevant work, she could work in such jobs as checker, garment sorter, or assembler of electrical accessories. Record at 36. She concluded, therefore, that Bobbitt was not disabled. Record at 37.

In her Request for Review, Bobbitt argues that the ALJ erred in evaluating her seizure impairment and her headaches. Specifically, she argues that the ALJ (1) mischaracterized the evidence with respect to her use of Keppra, an anti-seizure medication; (2) failed to give proper weight to the opinions of certain treating and examining physicians; and (3) failed to evaluate her headaches in accordance with Social Security Ruling ("SSR") 19-4p.

---

"but sometimes, their effects on nearby brain tissue, nerves or vessels may cause serious disability." *Id*. Symptoms include headache and seizures. *Id*. Bobbitt's meningioma was surgically removed on September 25, 2017. Record at 589.

IV.     *Discussion*

    A.     *Anti-Seizure Medication*

In determining that Bobbitt's seizure disorder did not meet or medically equal a listed impairment, the ALJ gave as one of her reasons: "[T]he claimant's Keppra level, when measured, was subtherapeutic." Record at 25. Bobbitt argues that this reliance on a "subtherapeutic" level of Keppra constituted error because, effective September 29, 2016, the Agency changed the listing for neurological disorders to eliminate the requirement of "compliance with 'therapeutic' levels of anti-seizure medications" because therapeutic ranges for many new antiepileptic drugs were not established.

The September 29, 2016, change to Listing 11, pertaining to neurological disorders, removed the requirement that claimants could not be found to have met the listing unless they were taking a therapeutic dose of medicine, as demonstrated by serum blood levels. Revised Medical Criteria for Evaluating Neurological Disorders, 81 FR 43048-01, 2016 WL 3551949. The Agency explained in a comment:

> Many newer AEDs [antiepileptic drugs] do not have established therapeutic levels, which makes lab results difficult for our adjudicators to interpret. We removed the requirement for obtaining blood drug levels to address this adjudicative issue and to simplify evaluation of seizures that satisfy the listing criteria.

*Id*. Nevertheless, the comment added: "[W]e will continue to consider blood drug levels available in the evidence in the context of all evidence in the case record." *Id*.

Thus, although the ALJ would not have been able to require a certain level of Keppra in Bobbitt's blood to find that her seizure disorder met a listing, or to have decided on her own initiative that a certain blood level was subtherapeutic, she was entitled to consider – as she did – a physician note which stated that the level of Keppra in Bobbitt's blood was "subtherapeutic."

5

However, Bobbitt does not argue here that her seizure disorder meets or equals an impairment under Listing 11. Therefore, it seems that she is more concerned with the ALJ's second reference to the same treatment note. In the context of explaining why she did not find Bobbitt's subjective complaints consistent with the medical records, the ALJ wrote: "After starting Keppra, she reported decreased frequency in her seizures, even though her Keppra level was subtherapeutic in April 2017." Record at 32.

I agree with Bobbitt that the treatment note to which the ALJ refers was of no real significance in this context. Although Bobbitt's seizures improved on the subtherapeutic dose of Keppra, the improvement was from two seizures per week down to two seizures in approximately a six-week period. Record at 474. As the note put it: "decreased seizure frequency though not resolved." *Id*.

This was not inconsistent with Bobbitt's testimony at her May 25, 2019, hearing that her seizures happened irregularly, and that her last one had been approximately two weeks before the hearing. Record at 59-60. Nor was it grossly inconsistent with the most recent relevant note: a January 18, 2019, report from Adam Kruszewski, M.D., Bobbitt's treating neurologist at Penn Medicine, who indicated that she had "grand mal or psychomotor" seizures approximately twice per month. Record at 903. There is no reason to think the medication Bobbitt was receiving in 2019 was subtherapeutic.

Thus, the ALJ's reliance on the April 2017 treatment note to discredit Bobbitt's testimony about her seizures was unwarranted. It is not clear whether this, standing alone, would require remand. However, combined with the ALJ's treatment of the medical opinion evidence, discussed below, it contributes to my conclusion that the evaluation of Bobbitt's seizures and headaches was inadequate.

B.   *The Medical Opinion Evidence*

1.   *Dr. Kruszewski*

As above, Adam Kruszewski, M.D., treated Bobbitt at Penn Neurology.  He submitted a check-off Seizure Questionnaire dated January 18, 2019, in which he indicated that Bobbitt had twice-monthly "grand mal or psychomotor" seizures.  Record at 903.  He also indicated that she had "minor motor seizures" with alteration of attentiveness occurring more frequently than once weekly, although he did not place a check by "significant interference with activity during the day."  *Id*.  Dr. Kruszewski added a handwritten observation:  "Note, clinical events have yet to be observed while on EEG."  *Id*.  However, Dr. Kruszewski checked off that Bobbitt was not a malingerer.  *Id*.

Dr. Kruszewski went on to indicate that Bobbitt had physical functioning which was reasonably consistent with the ALJ's conclusion that she could perform light work, except that he believed she required a sit/stand option.  Record at 904.  He also found that she suffered from depression, anxiety, and a "possible psychosis disorder."  Record at 905.  Dr. Kruszewski checked off that Bobbitt was "capable of low stress jobs," explaining that "stress can worsen seizure frequency."  *Id*.

Notably, Dr. Kruszewski also indicated that Bobbitt would be likely to be absent from work as a result of her impairments or treatment "about four days per month."  *Id*.  According to the vocational expert who appeared at the hearing, this number of absences was work-preclusive.  Record at 71 ("[E]mployers will normally tolerate a maximum absentee rate of up to one day per month … Anything more than these would become work preclusive").

7

The ALJ gave Dr. Kruszewski's report only limited weight, writing: "Dr. Kruszewski did not provide a narrative explanation for most of the limitations he assessed, which are not consistent with the evidence as a whole." Record at 34.

I agree with Bobbitt that this was an inadequate basis for failing to credit Dr. Kruszewski's finding about Bobbitt's likelihood of being absent from work four days in a month. It is fairly obvious that the explanation of this limitation was Bobbitt's seizures; after all, that is the only impairment for which Dr. Kruszewski treated her. Record at 903. It is unclear what "narrative explanation" would be needed to support this beyond the frequency of the seizures, which does appear in the questionnaire. Nor did the ALJ point to other evidence of record which was inconsistent with this particular finding. None is apparent on the record. On the contrary, it is supported by Dr. Bird's opinion, as discussed below. Record at 737.

Finally, the significance of Dr. Kruszewski's note that seizure activity had never been observed on EEG scans requires discussion, since the ALJ mentioned it several times, and also mentioned the "high suspicion" of Parul Agarwal, M.D., an internist, that Bobbitt actually suffered from "pseudoseizures." Record at 25, 29, 854. A "pseudoseizure" does not mean a faked seizure. As explained by the NIH:

> Pseudoseizure is an older term for events that appear to be epileptic seizures but, in fact, do not represent the manifestation of abnormal excessive synchronous cortical activity, which defines epileptic seizures. They are not a variation of epilepsy but are of psychiatric origin. … The most standard current terminology is psychogenic nonepileptic seizures (PNES). … Distinguishing PNES from epileptic seizures may be difficult at the bedside even to experienced observers. … Diagnostic delay of years with psychogenic nonepileptic seizures is common. … [I]n patients admitted to epilepsy monitoring units for unusual or intractable seizures, about 20% to 40% are diagnosed with PNES rather than epileptic seizures with extended video-EEG monitoring.

Https://www.ncbi.nlm.nig.gov/books/NBK441871.

Thus, even if Bobbitt suffered from pseudoseizures, rather than epileptic seizures capable of capture on EEG monitoring, the ALJ would still need to determine the frequency and severity of the pseudoseizures. It would not be logical to use the possibility of pseudoseizures to discredit Bobbitt's testimony, or the opinions of the medical practitioners, as to the amount of work she would miss.

2. *Dr. Bird*

Amber Bird, M.D., was one of the internists who treated Bobbitt at Penn Medicine. She submitted a "Functional Capacity Letter" dated August 9, 2018. Record at 737. She set forth Bobbitt's diagnoses as "seizures, meningioma status post-resection, depression." *Id*. She indicated that, if Bobbitt were to work, she would need accommodation for memory loss, and would need unscheduled breaks. *Id*. She would also need three or more sick days per month. *Id*.

When asked to describe how Bobbitt's "activities of daily living, social functioning, concentration, persistence, or ability to tolerate mental demands and stress" were affected by her diagnoses, Dr. Bird wrote: "Unexpected episodes of loss of consciousness, cognitive impairment and confusion. Work during this time would risk physical injury." *Id*.

As with Dr. Kruszewksi, the ALJ gave Dr. Bird's report only limited weight. Record at 34. He wrote: "[T]he accommodations Dr. Bird assessed are not consistent with the overall record, which documents little formal mental health treatment and improvement with medication." *Id*.

On the contrary, Dr. Bird's finding that Bobbitt would need three or more sick days per month is directly supported by Dr. Kruszewski's opinion that she would need four absences per month. Since Dr. Kruszewski issued his report a year after Dr. Bird, and was a neurologist rather

9

than an internist, it is not likely that he relied on her findings. Both of these opinions are also consistent with Bobbitt's testimony.

Further, as Bobbitt points out, her lack of extensive mental health treatment is irrelevant to Dr. Bird's report, which certainly attributed the "unexpected episodes of loss of consciousness" to Bobbitt's seizure disorder, and not her depression.

   3.  *Dr. Carlson*

The opinions of Drs. Kruszewski and Bird that Bobbitt would have a work-preclusive number of absences is also arguably supported by the observation of the consulting examiner, Robert J. Carlson, although he saw Bobbitt before her meningioma was removed. Record at 397. Dr. Carlson assessed Bobbitt for "seizures, brain tumor" on July 9, 2016. Record at 397. He opined that she would have difficulty with regular workplace attendance, "performing work activities on a consistent basis" and "performing a normal workday and workweek." Record at 400.

The ALJ rejected these findings on the basis that Dr. Carlson "did not specify the degree of limitation in the claimant's ability to … perform a normal workday and workweek." Record at 33. As the Commissioner rephrased it, "Dr. Carlson's opinion does not specify the amount of time [Bobbitt] would be off task or absent from work." Response at 11. However, given that the ALJ also rejected similar findings by Drs. Kruszewski and Bird, who *did* specify that Bobbitt would be absent three or four days per month, this is an unsatisfactory basis upon which to discount the opinion.

      4.     *Dr. Klebanoff*

David Klebanoff, M.D., performed a "neurological examination" of Bobbitt on April 24, 2017. Record at 501. He primarily evaluated Bobbitt's physiological capacities, such as the ability to sit, stand and walk, which he found to be somewhat more limited than those assessed by the ALJ. Record at 506-7. He commented on the effects of her seizure disorder or headaches only to note that she experienced seizures three to four times per month and that they were "prohibiting her from driving or being alone." Record at 501. He indicated in his assessment that she could not travel without a companion. Record at 511.

The ALJ quoted extensively from Dr. Klebanoff's findings upon physical examination, but also noted his finding that Bobbitt "could not travel without a companion for assistance." Record at 33. She then wrote: "Dr. Klebanoff's own examination findings, which were unremarkable, do not support the limitations he assessed. It seems that he relied heavily on the claimant's self-reported symptoms in rendering his opinion." *Id*. She gave Dr. Klebanoff's report only "limited weight." *Id*.

Bobbitt has not challenged the ALJ's conclusion as to her physical condition, so it is not necessary to evaluate the ALJ's treatment of Dr. Klebanoff's findings in that regard. However, I agree with Bobbitt that her normal physical examination findings are irrelevant to the frequency and severity of her seizures. Thus, the ALJ did not give a substantial reason to discount Dr. Klebanoff's finding that Bobbitt had three to four seizures per month at that time, and could not leave the house unaccompanied because of the likelihood of a seizure.

5.   *Ely Sapol, Ph.D.*

The ALJ gave "great weight" to an April 24, 2017, mental status report from Ely Sapol, Ph.D., a consulting psychologist. Dr. Sapol mentioned that Bobbitt was awaiting treatment for a meningioma, but he did not mention her seizures or headaches. Nor did the ALJ cite his report in connection with Bobbitt's seizures or headache. For this reason, the ALJ's evaluation of Dr. Sapol's report is irrelevant to the claims Bobbitt has raised here.

As a whole, however, Bobbitt has succeeded in showing that the ALJ's finding that Bobbitt's seizures were not disabling was not supported by substantial evidence. On the contrary, the evidence of record, including the opinions of treating physicians, Dr. Kruszewski and Dr. Bird, as well as consulting physicians Dr. Carlson and Dr. Klebanoff, indicated that Bobbitt's seizures would cause work absences at a level which the vocational expert testified was work-preclusive.

C.   *Evidence of Headaches*

At stage two of the sequential evaluation, the ALJ wrote:

> The claimant was … diagnosed with headaches by acceptable medical sources during the relevant period. However, the record does not evidence any limitations arising out of this condition, and various treatment notes indicate that it was sporadic and/or acute in nature (i.e., they did not last or have not lasted and were not or are not expected to last for a continuous period of twelve months), or it is stable and controlled. Because the evidence reveals that this impairment does not significantly limit the claimant's ability to do basic work activities, it is considered nonsevere. Nevertheless, the undersigned has considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the claimant's residual functional capacity.

Record at 24. (Internal citations omitted).

In fact, the record reflects complaints of frequent headaches throughout the period at issue. Record at 363 (May 20, 2016); 467 (November 11, 2016: "Main issue addressed today: … chronic headaches -6x/month); 495 (April 11, 2017: "Headaches increased in duration); 852

(November 19, 2018: "Concern for chronic headache since time of surgery").  This evidence indicates that Bobbitt's headaches lasted for over a period of twelve months, as is required to find an impairment severe

In any event, although the ALJ stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe" in assessing Bobbitt's RFC, she did not discuss absences potentially caused by headaches combined with absences caused by seizures to determine whether Bobbitt could maintain work attendance.  Since Bobbitt's ability to maintain work attendance was clearly an issue in the case, the ALJ should have done so.

      D.     *Remand v. Reversal*

When reversing the Commissioner's decision, a federal court may remand the matter to the Agency for a further hearing, or simply award benefits.  *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357-8 (3d Cir. 2008); *Zweibel v. Saul*, Civ. A. No. 190-1962, 2020 WL 2079189 at *11-12 (E.D. Pa. Apr. 30, 2020).  The decision to award benefits should be made only when the administrative record of the case has been developed fully and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits.  *Podedworny v. Harris*, 745 F.2d 210, 221-2 (3d Cir. 1984); *Brownawell*, *supra*.

In this case, the ALJ's decision regarding the severity and frequency of Bobbitt's seizures and headaches was not supported by substantial evidence.  Arguably, the record is fully developed in that it includes numerous medical opinions as well as treatment records and testimony from Bobbitt.  Nevertheless, it is not clear that the evidence as a whole indicates that Bobbitt is disabled.  Bobbitt delayed taking her Keppra for a surprisingly long time after it was prescribed.  Record at 391 (Keppra prescribed by neurologist on July 7, 2016); 398 (Dr. Carlson reports on July 9 2016: "She was supposed to start Keppra but has not gotten a prescription

yet"); 469 (Internist notes on November 11, 2016, regarding Keppra: "Was prescribed in July but did not take it due to concern for liver damage"). She also delayed obtaining treatment for her meningioma. Record at 498 (Internist note from April, 2017: "Despite this being the center of each visit, Camina has not made appointments with neurology or neurosurgery").

This is not to say that Bobbitt's subjective description of her neurological issues is necessarily inconsistent with her treatment. While it is possible that the seizures are not as disabling as she claimed, her delay in seeking treatment could also have been a function of her severe mental illness, or of some other, unknown, factor.

There is also evidence that the seizures could be somehow connected to alcohol use or abuse. At the time Bobbitt's seizures began, she was drinking a pint of liquor per day. Record at 684. The ALJ alluded to this possibility by noting that Bobbitt's daughter told her mother's internist on October, 2017, that Bobbitt was drinking alcohol daily before the onset of seizures in 2014. Record at 32, 684. Of course, this does not necessarily mean that she was abusing alcohol in 2017 or thereafter.

Thus, Bobbitt's entitlement to benefits is not quite clear enough to warrant reversal. However, the ALJ's analysis of Bobbitt's seizures (whether epileptic or pseudoseizures) and her headaches was not supported by substantial evidence in her decision as it now stands. For this reason, I will order remand for a more careful and accurate discussion of the evidence with respect to the frequency and severity of those impairments. Both parties should be given the opportunity to brief this specific issue before the ALJ issues a new decision. *See Thomas v. Commissioner of Social Security*, 625 F.3d 798, 800-801 (3d Cir. 2010).

Finally, I note that passing, suggestive, references in a decision to alcohol use and delays in obtaining treatment are not enough to disprove disability. The Social Security regulations provide specific guidance for an ALJ when she decides that either substance abuse or treatment noncompliance is the cause of a claimant's disability. 20 C.F.R. §416.935 (substance abuse); 20 C.F.R. §416.939(a)-(b) (treatment noncompliance).

V.      *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be granted in part and the matter remanded to the Agency for further consideration of the evidence with respect to Bobbitt's seizure disorder and headaches, with the parties able to brief this issue before the ALJ issues a decision.


BY THE COURT:


*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE